1
2

## Marquiz Law Office
Professional Corporation

3

3088 Via Flaminia Court
Henderson, NV 89052
Phone: (702) 263-5533
Fax: (702) 263-5532
Craig A. Marquiz, Esq.
NV Bar #7437

4
5
6

Attorney for Plaintiff

7
8

**UNITED STATES DISTRICT COURT**

9

**DISTRICT OF NEVADA**

10
11

ROBERT L. GOLDMAN;

Case No.:        2:23-cv-1757

12

Plaintiff,

13

v.

14

VIGILANT INSURANCE COMPANY, a New
York corporation and member of the CHUBB
GROUP OF INSURANCE COMPANIES;
DOES 1 through 100, inclusive; and ROE
CORPORATIONS I through 100, inclusive,

**COMPLAINT &
DEMAND FOR JURY TRIAL**

15
16
17

Defendants.

18
19

COMES NOW Plaintiff Robert L. Goldman ("Goldman"), by and through his counsel of

20

record, Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C., and for his claims against

21

Defendant Vigilant Insurance Company, a member of the Chubb Group of Insurance Companies

22

(hereinafter "Chubb"), avers and alleges as follows:

23

**JURISDICTION & VENUE**

24

1.        Jurisdiction in this matter is premised upon diversity of citizenship pursuant to

25

28 U.S.C. § 1332, as the parties hereto are citizens of different States and the damages claimed

26

by Plaintiff in this action exceeds the sum of 75,000.00, exclusive of interest and costs.

27

2.        Venue of this matter is properly before this Court as the underlying real property,

28

causes of action and corresponding damages are alleged to have occurred within this forum.

**PARTIES**

3.      Plaintiff Goldman is, and at all material times was, a California domiciliary who owns a single family residence located 6820 Tomiyasu Lane, Las Vegas, Clark County, Nevada, Assessor's Parcel Number 177-01-602-015 (the "Tomiyasu Property").  At all material times, the Tomiyasu Property was insured by Defendant Chubb through a Masterpiece Homeowner's Policy, Policy No. 14313565-03 ("Masterpiece Policy").

4.      Defendant Vigilant Insurance Company is, and at all material times was: (a) a stock insurance company incorporated in New York and a member of the Chubb Group of Insurance Companies ("Chubb"); (b) authorized to do and doing business in Clark County, Nevada as a property and casualty insurer; and (c) which caused acts and events to occur within this forum from which Plaintiff's claims arose.

5.      Mr. Goldman is informed and believes and thereon alleges that each of the Defendants designated herein as DOES 1 through 100 are the principals, agents, employees, servants or partners of each other or were otherwise acting under the direction and control of Defendant Chubb and/or ROE CORPORATIONS 1 through 100, inclusive.  The true names and capacities, whether individual, corporate, associate or otherwise of DOES 1 through 100 and ROE CORPORATIONS 1 through 100, inclusive, are unknown to Mr. Goldman at this time, who therefore sues said Defendants by such fictitious names.  When the true names and capacities of said Defendants are ascertained, Mr. Goldman will seek leave to amend his Complaint to identify the true names and capacities of said Defendants.

**GENERAL ALLEGATIONS**

6.      Mr. Goldman fully incorporates herein by reference all allegations contained in paragraphs 1 through 5 of this Complaint.

7.      From February 4, 2015 through February 3, 2018, Mr. Goldman insured his Tomiyasu Property with Defendant Chubb pursuant to a Masterpiece Policy providing, among other coverages, "Deluxe House Coverage."

8.      Notably, pursuant to that Deluxe House Coverage, Defendant Chubb expressly represented, warranted and agreed that "a 'covered' loss include[d] all risk of physical loss to

2

1 [the Tomiyasu Property] or other property ..., unless stated otherwise or an exclusion applie[d]".

2 *See* Deluxe House Coverage at p. B-4.

3      9.    Defendant Chubb further represented, warranted and agreed that the underlying

4 Policy would provide "coverage against physical loss if the [Tomiyasu Property]" or its contents

5 [were] damaged, destroyed or lost." *See* Coverage Summary Renewal at Homes and Contents;

6 *see also* Introduction ("Policy means your entire Masterpiece Policy, including the Coverage

7 Summary ...").

8      10.    Notably, an "[o]ccurrence" was expressly defined to mean "a loss or accident to

9 which [the underlying] insurance applies occurring within the policy period" and a "[c]ontinuous

10 or repeated exposure to substantially the same general conditions unless excluded [was]

11 considered to be one occurrence." *See* Masterpiece Policy at Introduction (Definitions).

12 **Mr. Goldman's 2016 Guest House / Stable Building Claim**

13      11.    On approximately February 22, 2016, Mr. Goldman submitted a claim to

14 Defendant Chubb under his Masterpiece Policy for cracking in the exterior walls and cement

15 floor of the guest house / stable building at the Tomiyasu Property, along with sunken earth in

16 one of the horse stalls.

17      12.    On March 15, 2016, Defendant Chubb:  (a) acknowledged its receipt of

18 Plaintiff's "Guest House / Stable Claim;" (b) assigned Claim Number 040516012197 to that loss;

19 and (c) notified Mr. Goldman that since Chubb had not yet completed an investigation of the

20 loss, it was reserving its rights as to potential coverages that may apply under his Masterpiece

21 Policy.

22      13.    On March 24, 2016, FAST Plumbing Service, Inc. ("FAST Plumbing")

23 performed an electronic leak detection at the Guest House / Stable Building and, in that regard,

24 determined that a plumbing leak / failure occurred on a three-quarter inch (3/4") copper

25 pressurized potable water line located below the slab.

26      14.    On March 31, 2016, Defendant Chubb notified Mr. Goldman that the under-slab

27 plumbing leak / failure "may have caused and/or contributed to the [resulting] damage" and, as a

28 such, Chubb was continuing its investigation to determine the following items:

A.    The cause(s) of the loss;

B.    The extent of movement of the structure;

C.    The extent of damage to the structure;

D.    The extent of movement and condition of the soils;

E.    The repair protocol to stabilize the soils; and

F.    The scope and repair cost of structural and cosmetic repairs.

15.    At that same time, Defendant Chubb directed Mr. Goldman to "retain a geotechnical engineer, a structural engineer, and a building contractor as these entities [would] be required to reach an agreement [with Chubb's experts] on the items outlined above, complete destructive/exploratory investigation, provide repair plans/drawings, complete a repair estimate, and complete the repairs."

16.    Mr. Goldman, at Defendant Chubb's directive, retained the specified engineering professionals, including, without limitation, Geotechnical & Environmental Services, Inc. ("GES") as its geotechnical engineer and J & J Engineering and Testing, Inc. ("J&J Engineering") as its structural engineer.

17.    On May 11, 2016, Defendant Chubb issued a supplemental reservation of rights letter advising Mr. Goldman that an investigation of this loss was necessary, including, without limitation, "the circumstances leading up to [his] loss, cause of loss, ensuing damages, pre-existing damage, soil conditions, and other facts and conditions which may have influenced this loss."

18.    In furtherance thereof, Defendant Chubb engaged several engineering firms to assist Chubb with its investigation, including:  (a) Madsen, Kneppers & Associates ("MKA" as its construction consultant); (b) Ninyo & Moore ("N&M" as its geotechnical engineer); and (c) Thorton Tomasetti (as its structural engineer).

19.    Over the next several months, the parties' experts and representatives participated in several joint inspections and exploratory testing sessions at Mr. Goldman Guest House / Stable Building purpose of assessing the structural integrity of that structure.

20.    In that regard, on August 8, 2016, Mr. Goldman's geotechnical engineer (GES) issued a forensic evaluation report detailing, among other things: (a) the existence of hydro-collapsible soil under the Guest House / Stable Building; (b) the presence of void-spacing created by the under-slab plumbing leak / failure; (c) the need to stabilize the foundational structure and subsurface soils; and (d) a three-tiered repair recommendation.

21.    Namely: (1) the installation of helical piers within and around the entirety of the structure to bring the foundational system back to its original elevation; (2) contact grouting beneath the affected areas after the foundation was lifted to fill the voids that form between the footing and slab and the underlying soils; and (3) compaction grouting to stabilize subsurface voids or loose soils through filling the affected areas with a low-slump, low mobility aggregate grout.

22.    On August 22, 2016, Defendant Chubb notified Mr. Goldman that the Guest House / Stable Building's under-slab plumbing leak / failure was a fully covered loss under Mr. Goldman's Masterpiece Policy (i.e., that no exclusions or limitations applied) and, to that end, Defendant Chubb requested that the parties' experts continue working together to "reach an agreement on the repair scope and restoration costs associated with bringing the structure back to [its] pre-loss condition."

23.    On December 14, 2016, after additional site inspections and phone conferences between the parties' experts had been conducted, Defendant Chubb completed its investigation and communicated its agreement with Plaintiff's experts' findings and repair methodology.

24.    Notably, based upon the existence of hydro-collapsible soil (i.e., soil which collapses with the introduction or presence of water) and the existence of void spaces underneath the structure (created as a direct and proximate result of the under-slab plumbing failure / leak), Defendant Chubb agreed that the repair methodology set forth in GES's Forensic Evaluation Report was appropriate, that the structural pier calculations set forth by J&J Engineering were warranted, and that Mr. Goldman's cost of repair was reasonable.

25.    On or about January 11, 2017, Defendant Chubb tendered payment in full for the Guest House / Stable Building Claim and, on or about August 24, 2018 closed this Claim.

**Mr. Goldman's 2017 Main Residence Claim**

26.    On January 5, 2017, Mr. Goldman submitted a claim to Defendant Chubb under his Masterpiece Policy for cracking in the interior walls and ceilings in several rooms of the main residence of the Tomiyasu Property ("Main Residence Claim").

27.    At that time, Defendant Chubb:  (a) acknowledged its receipt of Plaintiff's Main Residence Claim; (b) assigned Claim Number 047517000417 to that loss; and, shortly thereafter, (c) assigned the same adjuster to this Claim that had previously adjusted the Guest House / Stable Building loss (i.e., Willie Mack).

28.    On January 12, 2017, Mr. Goldman contacted Defendant Chubb to advise that FAST Plumbing had been engaged to perform an electronic leak detection of Plaintiff's Main Residence and, in response, Defendant Chubb advised that, "[s]hould a leak be found, [the] plumber should ... repair the leak."

29.    On January 16, 2017, FAST Plumbing determined that a plumbing leak / failure occurred on a one inch (1") copper pressurized potable water line located below the Main Residence slab and, as directed, FAST Plumbing made the necessary repair.

30.    On January 22, 2017, Defendant Chubb issued a reservation of rights letter to Plaintiff, advising, among other things, that: (a) it had engaged N&M as its geotechnical engineer and Thornton Tomasetti as its structural engineer to inspect the Main Residence; and (c) that said engineers would assist Chubb in its investigation of "the circumstances leading up to this loss, cause of loss, ensuing damages, pre-existing damage, soil conditions, and other factors and conditions which may have influenced this loss."

31.    On February 4, 2017, Plaintiff's Masterpiece Policy and his Deluxe House Coverages were renewed for another year, providing $8,711,000 in Dwelling Coverage and $6,097,700 in Deluxe House Coverages through February 4, 2018.

32.    Over the next several months, the parties' experts and representatives participated in several joint inspections and exploratory testing sessions at the Main Residence to assess the structural integrity of that structure.

33.     On February 13, 2017, Mr. Goldman provided Defendant Chubb with several photographs and videos documenting the under-slab plumbing leak at the Main Residence, including, without limitation, a copy of Plumbing Service's Invoice detailing the nature and scope of repair.

34.     On February 17, 2017, Defendant Chubb's geotechnical expert (N&M) completed a manometer survey at the Main Residence.

35.     On April 9, 2017, Defendant Chubb advised Plaintiff, among other things, that: (a) the resulting slope in the foundational slab / floor of the Main Residence was caused by the underlying water leak; and (b) for Plaintiff's experts to review N&M's manometer survey results and advise as to their assessment thereof and repair recommendations.

36.     On April 14, 2017, Mr. Goldman provided Defendant Chubb with GES's (Plaintiff's geotechnical expert) forensic evaluation report of the Main Residence which detailed, among other things: (a) the existence of hydro-collapsible soil under the Main Residence; (b) the presence of void-spacing created by the under-slab plumbing leak / failure; (c) the need to stabilize the foundational structure and subsurface soils; and (d) a three-tiered repair recommendation.

37.     Namely: (1) the installation of helical piers within and around the entirety of the structure to bring the foundational system back to its original elevation; (2) contact grouting beneath the affected areas after the foundation was lifted to fill the voids that form between the footing and slab and the underlying soils; and (3) compaction grouting to stabilize subsurface voids or loose soils through filling the affected areas with a low-slump, low mobility aggregate grout.

38.     Defendant Chubb, recognizing that identical subsurface conditions existed at the Main Residence as were present at the Guest House / Stable Building, directed Plaintiff to provide "a repair estimate for the recommendations outlined in the [GES] report" - recommendations that Defendant Chubb fully adopted and accepted for the Guest House / Stable Building as being appropriate, warranted and reasonable.

39.     On July 19, 2017, Defendant Chubb requested that a teleconference be held for the parties' experts to discuss GES's report and Plaintiff's repair estimate for the Main Residence.

40.     On July 27, 2017, the teleconference was held and, during that call: Defendant Chubb requested that:  (a) Plaintiff provide a drawing detailing the location of helical piers within and around the Main Residence; and (b) a supplemental site inspection for the parties' experts be scheduled.

41.     On August 11, 2017, the parties' representatives and their respective experts participated in a site inspection to assess the then-existing conditions and determine what, if any, additional testing that might need to be completed.

42.     At that same time, N&M, Defendant Chubb's geotechnical engineer, performed another manometer survey of the northwestern portion of the Main Residence - a survey which confirmed the existence of on-going and progressive damage.

43.     Plaintiff, to further assess the nature and extent of that on-going and progressive damage, conducted additional visual inspections and evaluative testing, including, without limitation, the digging of various test pits around the northwestern portion of the Main Residence on October 29, 2017.

44.     Those inspections and evaluative testing confirmed the absence of footings at areas along the northwestern portion of the Main Residence (i.e., a slab on grade construction); the existence of void spaces between the slab and the building pad footings; void spacing between the slab and finish grade; and the absence of a footing or grade beam between the game room and bathroom where the under-slab plumbing leak occurred.

45.     On November 7, 2017, Plaintiff provided Defendant Chubb with copies of the photographs and findings of Plaintiff's site inspections and evaluative testing, along with an estimate to repair the conditions existing (and known) at that time.

46.     Namely, repairs which included the installation of 19 helical piers, contact grouting to fill the voids that form between the footing and slab and the underlying soils once the

slab was lifted; and (3) compaction grouting to stabilize subsurface voids or loose soils through filling the affected areas with a low-slump, low mobility aggregate grout.

47.     On December 18, 2017, Defendant Chubb notified Plaintiff that Chubb would not be renewing Plaintiff's Masterpiece Policy or Deluxe House Coverages for the 2018-2019 policy year and, as such, it was necessary for Mr. Goldman to secure alternative insurance arrangements for the Tomiyasu Property.

48.     On January 2, 2018, Defendant Chubb's adjuster (Willie Mack) advised Plaintiff's counsel via electronic mail that Defendant Chubb believed that only three (3) helical piers were necessary to stabilize the Main Residence and, to that end, Chubb was tendering a partial payment of $125,001.54 – an amount which Defendant Chubb unilaterally and arbitrarily decided was "the undisputed amount" of the Main Residence Claim.

49.     Notwithstanding the foregoing, on January 23, 2018, Defendant Chubb requested additional documentation from Plaintiff – documentation further substantiating GES's repair recommendations and the installation of helical piers within and around the Main Residence.

50.     On January 27, 2018, Plaintiff notified Defendant Chubb of additional drywall cracking throughout the Main Residence and exterior structural cracking / separation that had been observed by Plaintiff's experts as they were gathering information in response to Defendant Chubb's request for additional information supporting for GES's helical pier recommendation.

51.     On February 13, 2018, a site inspection was held for the parties' representatives and their respective experts to assess the additional damages that had materialized at the Main Residence and to determine what, if any, additional testing was necessary to further assess same.

52.     Over the next several months, Plaintiff's experts conducted multiple visual inspections and exploratory testing at the Main Residence to assess the structural integrity of that structure and the deteriorating conditions resulting from the under-slab plumbing leak.

53.     On April 17, 2018, Defendant Chubb's adjuster (Willie Mack) and Plaintiff's representative addressed, among other topics, the status of the Main Residence Claim, including, without limitation, GES's anticipated soil core sample drilling to be conducted in early June, 2018.

54.     On June 1, 2018, Plaintiff notified Defendant Chubb that GES's soil core sample drilling would begin on June 4, 2018 and continue each day thereafter until completed, and that Defendant Chubb and its geotechnical engineer, N&M, were invited to attend and participate.

55.     In response, Plaintiff learned that Defendant Chubb's adjuster, Willie Mack, had resigned from his position and that all further inquiries regarding Plaintiff's claims were to be directed to Mr. Mack's immediate supervisor, Dave Trippel.

56.     On June 4, 2018, Defendant Chubb's representative (Mr. Trippel) advised that N&M had been notified of the testing and would be observing same.

57.     On June 8, 2008, Mr. Goldman was notified by Defendant Chubb of Defendant's new adjuster assignment for the Main Residence and Loss of Use Claims (i.e., Tommy Le).

58.     On July 31, 2018, Plaintiff's and Defendant Chubb's representatives conferred telephonically regarding, among other things: (a) the status of Plaintiff's Main Residence Claim; (b) additional evaluative testing and damage assessment that was planned; and (c) the coordination of a site inspection for August 8, 2018 so that Mr. Le (Defendant Chubb's newly assigned adjuster) could visually inspect the Tomiyasu Property and assess, first-hand, the nature and extent of the resulting damages that occurred as a result of the under-slab plumbing leak at the Main Residence.

59.     On August 7, 2018, Plaintiff received and produced GES's supplemental Forensic Geotechnical Evaluation report to Defendant Chubb.  Notably, in that report, GES concluded the following with regard to Plaintiff's Main Residence Claim:

    A.     There was a moderate to high potential for soil movement due to the applied load of the structure and increased moisture conditions.  The movement of the soils supporting the structure footings had led to settlement of portions of the structure.

    B.     The floor level survey performed indicated vertical displacements of between 3 and 4 inches at the location of the reported water leak ...; approximately 3 inches across the family room floor, and 2 to 3 inches across the upstairs master bedroom floor.

C.     Cracks in both the interior and exterior walls and ceiling were observed at multiple locations throughout the residence ... and were likely the result of soil movement beneath the footings supporting the residence.

D.     Due to the hydro-collapse potential of the soils encountered in the excavations performed at the site, recent distress observed at various locations throughout the structure, results of the recent manometer survey, and the history of plumbing leaks in the residence, it is recommended that helical piers be utilized around the entire structure to stabilize movement of foundations and prevent additional damaging differential settlement of foundations from occurring.

60.     Moreover, GES reiterated that, due to the (a) the existence of hydro-collapsible soil under the Main Residence; (b) the presence of void-spacing created by the under-slab plumbing leak / failure; and (c) the need to stabilize the foundational structure and subsurface soils, that a three-tiered repair recommendation was necessary.

61.     Namely: (1) the installation of helical piers within and around the entirety of the structure to bring the foundational system back to its original elevation; (2) contact grouting beneath the affected areas after the foundation was lifted to fill the voids that form between the footing and slab and the underlying soils; and (3) compaction grouting to stabilize subsurface voids or loose soils through filling the affected areas with a low-slump, low mobility aggregate grout.

62.     On August 20, 2018, Defendant Chubb discussed GES's supplemental Evaluation report with its own geotechnical expert (N&M) and structural engineer (Thorton Tomasetti) and, thereafter, noted that said experts wanted to revisit the Tomiyasu Property and reassess the then-existing conditions in light of GES's supplemental report.

63.     On August 31, 2018, another site inspection was held and, at that time, the parties' representatives and respective experts, among other things, inspected the then-existing conditions and discussed GES's supplemental conclusions regarding same.

64.     Notably, the parties' agreed that their respective geotechnical engineers (i.e., GES for Plaintiff and N&M for Defendant Chubb) would confer regarding GES's supplemental

conclusions and endeavor to agree-upon the appropriate repair methodology to fully repair Plaintiff's Main Residence and restore same to its pre-loss condition.

65.    To that end, in a subsequent phone conference between the parties' respective geotechnical engineers, Defendant Chubb's geotechnical experts noted that additional repairs (i.e., repairs greater than what N&M had previously specified) were required and that the appropriate repair methodology would include helical piers up to the amount of piers previously specified by Plaintiff's experts.

66.    Shortly thereafter, Defendant Chubb acknowledged in writing that its geotechnical engineer (N&M), "opined that the bathroom pipe break caused damages to the north side of the Main Residence." Defendant Chubb, however, erroneously suggested that payment for the resulting damage had already been made - a position contrary to what Defendant Chubb's geotechnical expert had previously conveyed regarding the need for additional repairs (i.e., beyond what N&M had previously specified).

67.    On December 17, 2018, another site inspection was held and, at that time, the parties' representatives and respective experts inspected the then-existing conditions and discussed, among other things, the volume of water that was introduced into the subsurface soils from the underlying plumbing leak and resulting damages related thereto.

68.    On January 10, 2019, GES issued a Revised Geotechnical Forensic Evaluation Report to specifically opine as to the volume of water that was likely introduced into the subsurface soils and the resulting damages to the Main Residence as a result thereof.

69.    In this regard, GES concluded that "[t]he leak in the copper pipe spraying beneath the bathroom floor in the northwest portion of the residence (discharging at a rate of 3,000 to 4,000 gallons per day) could have deposited a volume of water into the subgrade soils beneath the house slab of 225,000 to 300,000 gallons over the 2½-month time period [i.e., between the end of October 2016, when that area of the Main Residence was last used, until January 2017 when the leak was discovered].

70. GES also opined that the aforementioned "volume of water would have penetrated beneath other areas of the residence and likely have caused the movement of subgrade soils throughout the residence."

71. On January 15, 2019, Plaintiff provided Defendant Chubb with a copy of GES's Revised report along with two videos memorializing FAST Plumbing's prior inspection / repair of the Main Residence plumbing failure and the volume of water flowing out from the 1/8" hole in the copper pipe.

72. On February 11, 2019, Plaintiff provided Defendant Chubb with a bid detailing the costs associated with the installation of helical piers within and around the Main Residence, along with contact and compaction grouting.

73. On February 12, 2019, Defendant Chubb advised that its geotechnical engineer (N&M) wanted to perform a subsurface evaluation by excavating a shallow test pit and two slab cores in the northern half of the game room.

74. On February 19, 2019, N&M performed the aforementioned testing.

75. On February 27, 2019, Defendant Chubb requested, and that same day Plaintiff signed and returned, an "Authorization to Obtain Information" form so that Defendant Chubb could obtain information from AIG regarding a prior, unrelated claim at the Tomiyasu Property.

76. On March 15, 2019, another site inspection was held and, at that time, the parties' representatives and respective experts inspected the then-existing conditions and discussed, among other things, Plaintiff's damages and cost of repair.

77. On April 24, 2019, Defendant Chubb's geotechnical expert (N&M) returned to the site to perform another manometer / floor level survey of the Main Residence.

78. On May 29, 2019, Plaintiff provided J & J Engineering's helical pier plan to Defendant Chubb detailing the location of the 81 piers (interior and exterior) necessary to stabilize the Main Residence.

79. On June 28, 2019, Defendant Chubb provided Plaintiff with a copy of N&M's Geotechnical Evaluation – a report which egregiously concluded that the resulting

damage from the Main Residence plumbing leak was limited to the northern portion of the game room and, as such, only minimal repairs were necessary.

80.     On July 8, 2019, Defendant Chubb provided Plaintiff with a copy of MKA's Cost Estimate to repair the items set forth in N&M's limited Repair Scope (i.e., the bathroom and game room).

81.     On August 7, 2019, another site inspection was held and, at that time, the parties' representatives and experts inspected the then-existing conditions, and discussed the limited scope and incomplete cost of repair reports from Defendant Chubb's experts (N&M and MKA).

82.     Notably, at that meeting, representatives from Defendant Chubb's geotechnical expert (N&M) conceded that certain damage elements were not addressed or otherwise included in its proposed scope of repairs and, to that end, a revised scope would be provided by N&M and a revised cost of repair from MKA.

83.     On August 29, 2019, Defendant Chubb disclosed a letter from N&M to Chubb revising its prior Geotechnical Evaluation report to include additional helical piers along the northwestern portion of the Main Residence.

84.     On September 4, 2019, at Plaintiff's request, GPRS Subsurface Scanning Solutions ("GPRS") performed a ground penetrating radar scan of the Main Residence and, at that time, GPRS confirmed the existence of void-spaces at varying depths below the Main Residence slab and concluded that said voids were created by water emanating from the underlying plumbing leak.

85.     On September 9, 2019, Defendant Chubb disclosed a Revised Cost of Repair based upon the amended N&M report, increasing the purported (albeit incomplete) cost of their limited repair from $35,000 to $95,000 – a considerable departure from the multi-million dollar repair cost to properly and fully remediate the Main Residence.

86.     On September 11, 2019, Plaintiff: (a) provided Defendant Chubb with a copy of the GPRS Void Report; (b) notified Chubb of their scheduled core drilling to begin on October 1, 2019; and (c) invited Chubb and its experts to attend that evaluative testing.

87.     On October 1, 2019, Plaintiff's experts conducted core drilling at the Main Residence. Several of those cores confirmed the existence of extensive void-spacing under the Main Residence slab, including, without limitation, a four (4) foot-plus deep void extending from the northwestern bathroom (the site of the Main Residence leak) into the game room, along with void spacing of varying depths at other locations throughout the home.

**Extra Living Expense or Fair Rental Value ("Loss of Use") Damages**

88.     On May 30, 2017, Defendant Chubb acknowledged that, since the repairs to the Guest House / Stable Building would be coordinated with the repairs to the Main Residence, the Tomiyasu Property may not be available to house the sales staff, employees, and people attending trade shows from Mr. Goldman's company, CELS Enterprises, Inc.

89.     In that regard, Defendant Chubb wanted to make Mr. Goldman "aware of the Extra Coverage policy provision for Fair Rental Value that [was and] is available during the period of restoration."

90.     Namely, "[i]f a covered loss makes a part of [his] house or other permanent structure which [Mr. Goldman] usually rented to others uninhabitable, [Defendant Chubb] cover[s] its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition."

91.     Moreover, [t]hat period of time [was] not limited by the expiration of [Plaintiff's Masterpiece Policy]" under the Deluxe House Coverage - Extra Coverages provision.

92.     To that end, on February 1, 2018, Mr. Goldman notified Defendant Chubb that Plaintiff would be advancing a loss of use claim and that a letter detailing said those damages would be provided in the near future.

93.     In that regard, on February 3, 2019, Plaintiff fully documented his loss of use claim and, at that time, provided Defendant Chubb with, among other documentation: (a) copies of Plaintiff's leases with CELS Enterprises, Inc., and all extensions thereof; and (b) a summary of the damages sustained as a result of CELS Enterprises' inability to use the Main Residence for its intended purposes since January 5, 2017 (i.e., thirteen (13) months at Ten Thousand and No/100 Dollars ($10,000) per month, or One Hundred Thirty Thousand and No/100 Dollars ($130,000)).

94.     At that same time, Plaintiff advised Defendant Chubb that his damages would continue to accrue until such time as the Main Residence was restored to a habitable and usable condition.

95.     On May 3, 2019, having heard nothing from Defendant Chubb regarding the status of Plaintiff's Loss of Use Claim, Plaintiff updated Chubb regarding the amount of damages then due (i.e., based upon the fair rental value of the Tomiyasu Property) and reiterated that said damages would continue to accrue until the Main Residence was fully remediated and livable once again.

96.     On May 13, 2019, Defendant Chubb inquired as to the existence of a current lease with CELS Enterprises and, at that same time, suggested that the Fair Rental Value of Plaintiff's home was $12,500 (i.e., based upon Defendant Chubb's identification a smaller rental home in a less desirable area of the Las Vegas metropolitan area).

97.     On May 29, 2019, Mr. Goldman: (a) updated Defendant Chubb regarding the amount of the Loss of Use damages then due (i.e., $545,000); (b) clarified that the Chubb-identified property was readily distinguished from Plaintiff's Tomiyasu Property; (c) reiterated that his damages would continue to accrue by $25,000 per month (i.e., the fair rental value) until the property was fully remediated and habitable once again; and (d) demanded that his Loss of Use Claim be paid immediately.

98.     In particular, Mr. Goldman clarified that although the last lease extension with CELS Enterprises expired on December 31, 2017, CELS Enterprises was unable to use the Tomiyasu Property for its intended purpose after the underlying Main Residence plumbing leak was discovered in January 2017.  As a result, Mr. Goldman lost rental revenue from CELS Enterprises in the principal amount of $120,000 (i.e., $10,000 per month for 12 months – January 2017 through December 2017), plus the fair rental value of an additional $425,000 (i.e., $25,000 per month for 17 months – January 2018 through May 2019) based upon comparable properties within the immediate area, for a total of $545,000 through May 31, 2019.

99.     That same day, Defendant Chubb's adjuster (Tommy Le) advised that he would review Mr. Goldman information and respond thereto.

16

1    100.    No response, however, was provided.

2    101.    On June 28, 2019, a Chubb Investigator (Mark Bertrand) left a voice-mail

3    message for Mr. Goldman's personal and CELS Enterprises' corporate counsel advising that he

4    had "one niche [of Mr. Goldman claim] that he was hoping to cover with [him]" relating to

5    CELS' use of Mr. Goldman's residence.

6    102.    That same day, undersigned counsel advised Defendant Chubb that any requests

7    for information related to Mr. Goldman's Loss of Use Claim would need to funnel through

8    undersigned counsel's office and, to that end, for Defendant Chubb to advise as to what

9    information it required.

10    103.    On July 19, 2019, Defendant Chubb (Mr. Bertrand) noted that his request was "to

11    have the opportunity to speak with [Mr. Goldman's personal and CELS Enterprises' corporate

12    counsel] directly ... to clarify information that [Chubb] received from [its] agent's office."

13    104.    On July 23, 2019, Defendant Chubb was advised that Plaintiff would make his

14    personal and CELS Enterprises' corporate counsel available for a call; however, to ensure that

15    Chubb's questions did not invoke the attorney/client privilege, undersigned counsel would

16    monitor that call.

17    105.    On July 26, 2019, Defendant Chubb's representative proposed two dates and

18    times for that call and, before Mr. Goldman could advise as to which date/time worked best,

19    Defendant Chubb stated that it would need to defer the call until Chubb was "in a position to

20    move forward with either further discussions or requests for a greater degree of supporting

21    documentation to arrive at a more informed position" regarding Plaintiff's Loss of Use Claim.

22    106.    On July 29, 2019, Mr. Goldman provided Defendant Chubb with a detailed

23    summary of the facts surrounding Defendant Chubb's failure to timely and properly process his

24    Loss of Use Claim, including, without limitation, documentation memorializing: (a) Claim

25    submission; (b) Mr. Goldman's production and satisfaction of all proof of loss requirements;

26    (c) his repeated pleas for assistance and demands for payment; (d) Defendant Chubb's failure to

27    investigate the claim as mandated by the Masterpiece Policy and Nevada law; and

28

(e) Defendant's multiple violations of Nevada Revised Statute 386A.300 *et seq.* (Nevada's Fair Claims' Processing Act).

107.    At that same time, Mr. Goldman reiterated his pleas for assistance and the immediate payment by Defendant Chubb of Plaintiff's Loss of Use damages incurred through July 31, 2019 (i.e., $595,000), plus $25,000 per month until Plaintiff's residence was fully remediated and habitable once again.

108.    Defendant Chubb, in response, egregiously stated that it was still reviewing Mr. Goldman request for Loss of Use damages.

109.    That same day, Mr. Goldman advised Defendant Chubb that:

A.    Nevada Administrative Code ("NAC") 686A.670(1), expressly provided that "[e]ach insurer shall establish procedures to begin an investigation of any claim within 20 working days of receipt of notice of the claim."

B.    Further, "[e]ach insurer shall maintain or otherwise provide to each claimant, a notice of all items, statements and forms, if any, which the insurer reasonably believes will be required of the claimant, within 20 working days after receiving notice of the claim."

C.    Moreover, "[e]ach insurer shall complete an investigation of each claim within 30 days after receiving notice of the claim, unless the investigation cannot reasonably be completed within that time." NAC 686A.670(2).

D.    "If the insurer needs more time to determine whether a claim of a first-party claimant should be accepted or denied, it must so notify the claimant within 30 working days after receipt of the proof of loss giving reasons that more time is needed." NAC 686A.675(3).

110.    On September 6, 2019, ten (10) days after being apprised that it was equitably estopped from denying coverage on Plaintiff's Loss of Use Claim and that it waived its right to investigate same, Defendant Chubb issued a letter requesting additional documentation from Mr. Goldman and baldly suggested that it had "been in frequent contact with [Mr. Goldman] in connection with this claim."

111.    In response, Mr. Goldman reiterated to Defendant Chubb that it waived its right to investigate his Loss of Use Claim, and that its untimely attempt to do so constituted further evidence of Chubb's violations of Nevada law and its claims handling obligations.

112.    Pursuant to Plaintiff's Masterpiece Policy, Defendant Chubb was, and is, obligated to provide up to $8,711,000 in Dwelling Coverage and $6,097,700 in Deluxe House Coverage for Plaintiff's Main Residence Claim.

113.    Pursuant to the express terms of the Masterpiece Policy and in accordance with established precedent from Defendant Chubb's prior payment, in full, of Plaintiff's Guest House / Stable Building Claim (an identical claim with mirror-image facts, including, without limitation, identical hydro-collapsible soil, void spacing and structural impairment of the requisite structure), Defendant Chubb was, and is, obligated to pay, in full, Plaintiff's remediation costs to return the Main Residence to its pre-loss condition, along with Plaintiff's Loss of Use damages in their entirety.

114.    Namely, for the installation of helical piers within and around the structure; contact grouting beneath the affected areas after the foundation has been lifted to fill the voids that form between the footing and slab and the underlying soils; and compaction grouting to stabilize subsurface voids or loose soils through filling the affected areas with a low-slump, low mobility aggregate grout.

115.    Here, despite Mr. Goldman sustaining covered property loss to his dwelling in excess of $1.5 million (calculated as of December 1, 2019) and Defendant Chubb previously acknowledging that the underlying loss was covered by Mr. Goldman's Masterpiece Policy, Defendant Chubb, nevertheless, failed, refused and neglected to tender payment to completely remediate the Main Residence and return same to its pre-loss condition.

116.    Further, despite Mr. Goldman sustaining Extra Living Expense or Fair Rental Value ("Loss of Use") damages in excess of $720,000 through December 31, 2019 (with said damages continuing to accrue in the principal amount of $25,000 per month until the Main Residence was fully remediated and habitable once again) and Defendant Chubb previously

acknowledging that Plaintiff's Loss of Use damages were covered by the Deluxe House Coverages of the Masterpiece Policy, Defendant Chubb failed, refused and neglected to tender any payment on this claim.

117.    Defendant Chubb's failure, refusal and/or neglect to tender payment for the covered property loss to Plaintiff's Main Residence, in turn, prevented Plaintiff from commencing repairs to his Main Residence and Guest House / Stable Building and, even more troubling, forced Mr. Goldman to sustain hundreds of thousands of dollars in Loss of Use damages.

118.    As a direct, proximate and foreseeable cause of Defendant Chubb's conduct, Plaintiff has been required to retain the services of an attorney to pursue his affirmative claims for relief and, therefore, is entitled to recover his reasonable attorney's fees and costs incurred in the prosecution of this action pursuant to Nevada law and the Masterpiece Policy.

119.    On December 30, 2019, Mr. Goldman filed suit in the United States District Court for the District of Nevada against Defendant Chubb alleging, among other causes of action, claims for: (a) declaratory relief; (b) breach of contract; (c) breach of the implied covenant of good faith and fair dealing; (d) negligence / negligence per se; (e) negligent hiring, training and supervision; Case No. 2:19-cv-02227-JAD-BNW ("Underlying Action") at Dkt. No. 1.

120.    On March 13, 2020, Defendant Chubb moved to dismiss Counts Four (negligence / negligence per se) and Five (negligent hiring, training and supervision) of Plaintiff's Complaint in the Underlying Action.

121.    The Court held a hearing on said Motion and, at that time, Plaintiff was afforded leave to file an Amended Complaint (essentially renaming his negligence / negligence per se claim as one for Statutory Violations under NRS 686A.310 and removing his negligent hiring, training and supervision claim).

122.    Plaintiff timely filed his First Amended Complaint (Dkt. No. 23) in that matter and Defendant Chubb subsequently filed its Answer thereto (Dkt. No. 24).

123.    A Discovery Plan and Scheduling Order was entered by the District Court and, in accordance therewith, the parties conducted extensive discovery, including, without limitation, the deposition of Mr. Goldman on January 22, 2021.

124.    After discovery had closed in the Underlying Action, Defendant Chubb, on August 30, 2021, filed a Motion for Summary Judgment contending, among other things, that Plaintiff's Complaint should be dismissed based upon Mr. Goldman having refused to sit for an Examination Under Oath - a condition precedent to his ability to file suit for his affirmative claims.

125.    Mr. Goldman opposed Defendant Chubb's Motion and, in his Opposition brief (Dkt. No. 33) reiterated his pre-suit arguments, among other things, that Defendant Chubb had either waived its right or was otherwise equitably estopped from doing so.

126.    On September 29, 2022, Judge Dorsey entered an Order Granting Defendant Vigilant's Motion for Summary Judgment in Part and Dismissing the Underlying Action without Prejudice (Dkt. No. 83), holding that Defendant Chubb did not waive its right nor was it equitably estopped from conducting an Examination Under Oath of Mr. Goldman and that, because said condition precedent had not been satisfied (notwithstanding a detailed deposition of him having been completed in the Underlying Action), dismissal without prejudice was appropriate so that Mr. Goldman could satisfy the condition and, thereafter, refile his lawsuit.

127.    Based upon Judge Dorsey's Order, Mr. Goldman, on October 7, 2022, requested that Vigilant advise within ten (10) days as to Vigilant's availability to complete an Examination Under Oath ("EUO") or, alternatively, if it were waiving same.

128.    On October 16, 2022, Vigilant, in response, noted that it would likely take Mr. Goldman's EUO and that it would provide a list of items that it believed had not been produced.

129.    Although no such list was ever produced, Vigilant requested, as a pretense to completing that examination, that Mr. Goldman produce documents responsive to Vigilant's September 6, 2019 letter.

130.    At that same time, however, Defendant Chubb filed a Motion to Alter or Amend Judgment seeking to change Judge Dorsey's ruling from "without prejudice" to "with prejudice." Dkt. No. 85.

131.    On January 31, 2023, while Vigilant's Motion was still pending, Mr. Goldman wrote Vigilant and advised: (1) that remediation efforts would be resuming (and Vigilant was invited to attend and participate); and (2) that all documents in his custody, possession and control that were responsive to Vigilant's prior enumerated requests had already been produced and, as a result, Vigilant had all of the information it required to fully conduct such an examination (i.e., if one were truly necessary).  To that end, Mr. Goldman detailed the specific exhibits (by Bates-label reference) and deposition transcripts where the specified information could be found.

132.    On February 6, 2023, Vigilant responded, noting that it disagreed with Mr. Goldman's assessment and that Vigilant, again, would be providing him with an itemized list of documents it believed had not yet been produced.  No such list, however, was ever produced.

133.    On February 15, 2023, Judge Dorsey denied Vigilant's Motion to Alter or Amend Judgment and expressly reiterated  that "Goldman's 'failure [to satisfy the EUO pre-suit] merely suspend[ed] his ability to bring suit' instead of permanently foreclosing coverage." Order (Dkt. No. 90).

134.    That same day, Mr. Goldman reiterated his request for Vigilant to confirm its availability for completing an EUO or, alternatively, to advise if it was waiving same.

135.    On February 16, 2023, Vigilant noted that it would be taking Mr. Goldman's EUO and that it, once again, would provide a list of items it believed were not produced.  Again, no such list was ever produced.

136.    On February 24, 2023, Vigilant advised that its coverage counsel, Gene Weisberg, Esq., was being re-engaged and requested, on March 16, 2023, Mr. Goldman's availability during the week of April 24, 2023 to conduct an EUO.

137.    Mr. Goldman's EUO was scheduled for April 27, 2023.

138.    While preparing for his EUO, Mr. Goldman learned that a former CELS marketing department employee had previously moved various photographs, invoices and invitations related to CELS marketing activities at the Tomiyasu Property to a personal folder on CELS computer System. Those photographs and invitations were produced on April 26, 2023 along with several repair invoices (supplementing Mr. Goldman's prior response regarding records of payment for repairs of water damage at the Goldman Residence).

139.    On May 15, 2023, Vigilant requested several additional documents from Mr. Goldman that were identified by Mr. Goldman in his EUO.

140.    On August 1, 2023, Mr. Goldman provided a comprehensive response to Vigilant's May 15, 2023 request for additional documentation, including, without limitation, a signed Supplemental Proof of Loss updating the nature and extent of his damage claims for Fair Rental Value / Loss of Use ($2,162,239.83) and Property Damages ($3,245,477.52) each calculated through July 31, 2023.

141.    On August 2, 2023, Vigilant acknowledged its receipt of Mr. Goldman's August 1, 2023 letter and supporting documentation.

142.    On August 31, 2023, Vigilant confirmed its receipt of Mr. Goldman's Supplemental Proof of Loss and supporting documentation and noted that its investigation and analysis of the information provided continued.

143.    As Vigilant knew (and its representatives previously confirmed through deposition testimony), Vigilant's statutory obligation to respond to a notification of a claim from an insured, like Mr. Goldman here, is within fourteen (14) days for e-mails and letters, and thirty (30) days for coverage opinions and status letters, of their submission.

144.    On August 29, 2019, Mr. Goldman reminded Vigilant of its statutory duties, expressly referencing Nevada Administrative Code ("NAC") 686A.670(1)(A)'s requirement for "[e]ach insurer [to] establish procedures *to begin an investigation of any claim within 20 working days of receipt of notice of the claim*." (Emphasis Added).

145.    Further, that "*[e]ach insurer shall complete an investigation of each claim within 30 days after receiving notice of the claim, unless the investigation cannot reasonably be completed within that time*." NAC 686A.670(2) (Emphasis Added).

146.    Notably, "*[i]f the insurer needs more time to determine whether a claim of a first-party claimant should be accepted or denied, it must so notify the claimant **within 30 working days after receipt of the proof of loss giving reasons that more time is needed***." NAC 686A.675(3) (Emphasis Added).

147.    Based upon the foregoing, Vigilant's coverage opinion, was due on or before September 1, 2023.

148.    Although Vigilant noted on August 31, 2023 that it's investigation and analysis of the information provided was continuing, its notice did not, nor does it, comply with NAC 686A.675(3).

149.    In this regard, Vigilant was required to provide a coverage opinion by that date or, alternatively, disclose that additional time was required, the reason(s) why and the anticipated date when such opinion would be issued.

150.    Although Mr. Goldman expressly reserved all rights with regard to any (now untimely) opinion that may be issued after his October 23, 2023 letter was received by Vigilant, he noted that, if Vigilant fails to issue a coverage opinion by 5:00 p.m. PST on October 27, 2023, he would proceed with the refiling of his Complaint.

151.    Vigilant did not issue a coverage opinion by the designated date and time (a date 83 days after Vigilant received Mr. Goldman's supplemental document production and signed Supplemental Proof of Loss.

24

152.    Defendant Chubb's conduct in, among other things, failing to honor its obligations under the applicable Policy, comply with Nevada's claims handling statutes and its own internal coverage response deadlines confirm that its purported need to conduct an EUO and consequent delays in issuing a coverage opinion regarding Mr. Goldman's Loss of Use / Fair Rental Value claim was merely a an egregious charade to avoid paying what it irrefutably owes on Mr. Goldman's claims and establishes the appropriateness of an award of punitive damages against Defendant Chubb for its abhorrent conduct.

**COUNT ONE**
**(Declaratory Relief)**

153.    Mr. Goldman fully incorporates herein by reference all allegations contained in paragraphs 1 through 152 of this Complaint.

154.    Despite Plaintiff's repeated demands for payment to Defendant Chubb of, among other expenses, Plaintiff's Dwelling and Loss of Use coverages, Chubb has failed, refused and neglected to honor its contractual payment obligations required by the applicable Masterpiece Policy and Deluxe House Coverages.

155.    A justiciable controversy exists between Plaintiff and Defendant Chubb regarding the existence and scope of available coverages under the applicable Masterpiece Policy and Deluxe House Coverages.

156.    Mr. Goldman's and Defendant Chubb's respective interests are adverse to one another.

157.    Mr. Goldman has a legally protectible interest in the outcome of this Court's resolution of said dispute.

158.    The issue is ripe for adjudication.

159.    As a direct, proximate and foreseeable cause of Defendant Chubb's failure to honor its contractual obligations, Mr. Goldman has sustained monetary damages and incurred attorney's fees and costs associated with advancing his pleas for help and coverage.

160.   As a result, Mr. Goldman seeks an Order from this Court compelling Defendant Chubb to: (a) immediately provide Mr. Goldman with all necessary Dwelling and Deluxe House Coverages as demanded by Plaintiff; (b) award Mr. Goldman damages for Defendant Chubb's failure to tender up to the full amount of available policy limits in satisfaction of Mr. Goldman's Main Residence and Loss of Use Claims; (c) tender all sums necessary to fully reimburse Mr. Goldman for all expenses he incurred as a direct, proximate and foreseeable cause of Defendant Chubb's conduct; and (d) reimburse Mr. Goldman for all of his attorney's fees and costs incurred with advancing his pleas for assistance and coverage, including, without limitation, fees incurred in prosecuting the Underlying Action and instant action as required by the underlying Masterpiece Policy and Nevada law.

## COUNT TWO
### (Breach of Contract)

161.   Mr. Goldman fully incorporates herein by reference all allegations contained in paragraphs 1 through 160 of this Complaint.

162.   The underlying Masterpiece Policy of insurance and Deluxe House Coverages constitute a valid, binding and enforceable agreement between Defendant Chubb and Mr. Goldman.

163.   Pursuant to this agreement, Defendant Chubb was, and is, obligated to provide, among other things, Dwelling and Loss of Use Coverages and payments to Mr. Goldman for claims arising under the applicable Masterpiece Policy and Deluxe House Coverages.

164.   Despite accepting coverage for Plaintiff's Main Residence and Loss of Use Claims, Defendant Chubb has failed, refused and neglected to honor its payment and coverage obligations.

165.   As a direct, proximate and foreseeable cause thereof, Defendant Chubb has materially breached its insuring agreement with Mr. Goldman.

166.     As a direct, proximate and foreseeable cause thereof, Mr. Goldman has suffered, and continues to incur, monetary damages in amounts to be established at trial, but which exceed this Court's minimum jurisdictional limit; plus accrued and accruing interest on all such sums, until paid in full; plus Mr. Goldman attorney's fees and costs; and all such other and further relief as this Court deems just and proper under the circumstances, including, without limitation, post-judgment attorney's fees and costs.

## COUNT THREE
### (Breach of Implied Covenant of Good Faith & Fair Dealing)

167.     Mr. Goldman fully incorporates herein by reference all allegations contained in paragraphs 1 through 166 of this Complaint.

168.     Implied within the underlying Masterpiece Policy and Deluxe House Coverages, and the relationship between Mr. Goldman and Defendant Chubb was, and is, a covenant of good faith and fair dealing, pursuant to which each party was bound to refrain from any act that would impair the benefits which the other party had the right to expect from the insuring agreement.

169.     Defendant Chubb, however, breached and materially breached the covenant of good faith and fair dealing owed to Mr. Goldman intentionally, with knowledge of the relevant facts or recklessly disregarding same, as evidenced by, among other things:

A.     Misrepresenting to Mr. Goldman pertinent facts or insurance policy provisions relating to any coverage at issue in violation of NRS 686A.310(1)(a);

B.     Failing to acknowledge and act reasonably promptly upon communications from Mr. Goldman with respect to claims arising under the Masterpiece Policy in violation of NRS 686A.310(1)(b) and NAC 686A.665;

C.     Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under the applicable Masterpiece Policy in violation of NRS 686A.310(1)(c);

D.    Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements had been satisfied in violation of NRS 686A.310(1)(d);

E.    Failing to effectuate prompt, fair and equitable settlements of Mr. Goldman's claims once the liability of Defendant Chubb became reasonably clear in violation of NRS 686A.310(1)(e);

F.    Failing to promptly provide Mr. Goldman with a reasonable explanation of the basis for available coverages in violation of NRS 686A.310(1)(n);

G.    Placing paramount importance on Defendant Chubb's own interests to the detriment of its insured, Mr. Goldman;

H.    Adopting restrictive policy interpretations based upon inadequate, improper and/or a non-existent investigation;

I.    Failing to properly and timely communicate with Mr. Goldman regarding his claims;

J.    Failing to properly indemnify Mr. Goldman for covered losses, expenses and damages;

K.    Failing to "establish procedures to begin an investigation of [Plaintiff's Loss of Use Claim] within 20 working days of receipt of notice of the claim" in violation of NAC 686A.670(1);

L.    Failing to provide Mr. Goldman with "a notice of all items, statements and forms, if any, which [Chubb] reasonably believe[d would] be required of the [them], within 20 working days after receiving notice of their [Loss of Use] claim" in violation of NAC 686A.670(1);

M.    Failing to "complete an investigation of [Plaintiff's Loss of Use Claim] within 30 days after receiving notice of the claim, unless the investigation [could not] reasonably be completed within that time" in violation of NAC 686A.670(2); and

N.    Failing to notify Mr. Goldman of any additional time that Chubb needed or otherwise required "to determine whether [his Loss of Use Claim would] be accepted or denied, within 30 working days after receipt of the proof of loss" in violation of NAC 686A.670(2).

170.    Defendant Chubb's conduct as described herein, including, without limitation, failing, refusing or otherwise neglecting to fully cover and pay for Mr. Goldman's Dwelling and Loss of Use damages, despite having accepted coverage for the underlying leak / water damage claim and acknowledging that Plaintiff's Loss of Use damages were covered losses under the Masterpiece Policy, was unfaithful to the purpose of the insuring agreement and not within the reasonable expectations of Plaintiff.

171.    As a direct, proximate and foreseeable cause of Defendant Chubb's wrongful conduct and its breaches, and material breaches, of the implied covenant of good faith and fair dealing, Mr. Goldman has suffered, and continues to sustain, monetary damages in amounts to be established at trial, but which exceed this Court's minimum jurisdictional limit; plus accrued and accruing interest on all such sums, until paid in full; plus Mr. Goldman's attorney's fees and costs incurred in the Underlying Action and the instant action; and all such other and further relief as this Court deems just and proper under the circumstances, including, without limitation, post-judgment attorney's fees and costs.

172.    Defendant Chubb's conduct was and is oppressive, malicious and carried out in bad faith and with conscious disregard for the rights and well being of Mr. Goldman, thereby warranting the assessment of exemplary and punitive damages.

### COUNT FOUR
**(Statutory Violations)**

173.    Mr. Goldman fully incorporates herein by reference all allegations contained in paragraphs 1 through 172 of this Complaint.

174.    The plain and unambiguous language of NRS 686A.310 *et seq*. imposes an express duty upon insurance carriers, including, without limitation, Defendant Chubb, to refrain from engaging in certain unfair claims practices.

175.    Plaintiff is among the class of persons that NRS 686A.310 *et seq*. was designed to protect as evidenced by NRS 686A.310(2) which expressly provides that "[i]n addition to any rights or remedies available to the [Insurance] Commissioner, an insurer is liable to its insured for any damages sustained by the insured as a result of the commission of any act set forth in [NRS 686.310] subsection 1 as an unfair practice."

176.    In this regard, Defendant Chubb breached its statutorily-imposed duties toward Mr. Goldman by engaging in, without limitation, the following acts:

A.    Misrepresenting to Mr. Goldman pertinent facts or insurance policy provisions relating to any coverage at issue in violation of NRS 686A.310(1)(a);

B.    Failing to acknowledge and act reasonably promptly upon communications from Mr. Goldman with respect to claims arising under their Masterpiece Policy in violation of NRS 686A.310(1)(b);

C.    Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under the applicable Masterpiece Policy in violation of NRS 686A.310(1)(c);

D.    Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements had been satisfied in violation of NRS 686A.310(1)(d);

E.    Failing to effectuate prompt, fair and equitable settlement of Mr. Goldman's claims once the liability of Defendant Chubb became reasonably clear in violation of NRS 686A.310(1)(e);

F.    Compelling Mr. Goldman to institute litigation to recover amounts due under his Masterpiece Policy and Deluxe House Coverages by offering substantially less than the amounts owed on the Main Residence Claim, despite having previously paid, in full, for identical

losses and damages for Plaintiff's Guest House / Stable Building Claim in violation of NRS 686A.310(f);

        G.     Failing to settle claims promptly, where liability of Defendant Chubb became reasonably clear, under one portion of the insurance policy in order to influence settlements under other portions of the insurance policy in violation of NRS 686A.310(l);

        H.     Failing to provide promptly to Mr. Goldman a reasonable explanation of the basis for available coverages in violation of NRS 686A.310(1)(n);

     177.    As a direct, proximate and foreseeable cause thereof, Mr. Goldman has suffered, and continues to sustain, monetary damages in amounts to be proven at trial, but which exceed this Court's minimum jurisdictional limit; plus accrued and accruing interest on all such sums, until paid in full; plus Mr. Goldman attorney's fees and costs incurred in the Underlying Action and instant action; and all such other and further relief as this Court deems just and proper under the circumstances, including, without limitation, post-judgment attorney's fees and costs.

## JURY DEMAND

Plaintiff demands a trial by jury on all jury claims asserted herein.

**WHEREFORE**, Mr. Goldman prays for Judgment in his favor and against Defendant Chubb on all claims asserted in this Complaint as follows:

        A.     A judicial declaration that Defendant Chubb's Masterpiece Policy and Deluxe House Coverages apply to Plaintiff's Main Residence and Loss of Use Claims;

        B.     A judicial declaration that Defendant Chubb was, and is, obligated to pay for, among other losses, Plaintiff's Main Residence Dwelling Claim and Loss of Use damages.

        C.     A judicial declaration that Defendant Chubb is obligated to cover Mr. Goldman's damages to the full extent of available coverages as set forth in the applicable Declarations Statement;

        D.     For monetary damages in an amount to be proven at trial;

E.      For punitive damages according to proof at trial;

F.      For pre-judgment interest on all such sums;

G.      For Mr. Goldman's reasonable attorney's fees and taxable costs, including, without limitation, those attorney's fees and costs incurred in the Underlying Action and the instant action; and

H.      For all such other and further relief as this Court deems just and proper under the circumstances, including, without limitation, post-judgment attorney's fees and costs.

Dated this 29th day of October, 2023.



Marquiz Law Office
Professional Corporation

By: /s/ Craig A. Marquiz, Esq.
Craig A. Marquiz, Esq.
3088 Via Flaminia Court
Henderson, NV 89052
Attorney for Plaintiffs